2019 IL App (1st) 173066

FIRST DIVISION
August 5, 2019
Modified upon denial of rehearing and supplement to opinion filed October 21, 2019

No. 1-17-3066

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| ELENA CHERNYAKOVA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | Appeal from the |
| v. | ) | Circuit Court of |
| | ) | Cook County |
| VINAYA PUPPALA, M.D.; NORTHWESTERN | ) | |
| MEMORIAL HOSPITAL; and MCGAW MEDICAL | ) | No. 13 L 9220 |
| CENTER OF NORTHWESTERN UNIVERSITY, | ) | |
| | ) | The Honorable |
| Defendants | ) | Jerry A. Esrig, |
| | ) | Judge Presiding. |
| (Northwestern Memorial Hospital and McGaw Medical | ) | |
| Center of Northwestern University, Defendants- | ) | |
| Appellees). | ) | |

JUSTICE PIERCE delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Griffin concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff Elena Chernyakova sued Northwestern Memorial Hospital (Northwestern),

McGaw Medical Center of Northwestern University (McGaw), and Vinaya Puppala, M.D.,

alleging that while she was hospitalized at Northwestern, Puppala—without plaintiff's consent—

electronically accessed her medical chart, and took and posted photos of her on social media.

The circuit court of Cook County entered summary judgment in favor of Northwestern and

McGaw (collectively defendants). Plaintiff proceeded to trial against Puppala. During the trial before a different judge, plaintiff and Puppala settled and requested a "hearing" where their attorneys outlined the terms of the "confidential" settlement. At the request of the parties, the trial court sealed the transcript of the hearing. Shortly after the settlement, plaintiff filed this appeal of the summary judgment orders entered in favor of defendants. While this appeal was being briefed, defendants obtained information about the terms of the settlement agreement that, in their view, called into question the validity of the factual underpinnings of this lawsuit. Defendants moved the trial court to unseal the transcript of the settlement proceedings so that the transcript could be considered in this appeal—even though those proceedings had no direct connection to the summary judgment proceedings—in support of their motion to dismiss this appeal and for sanctions pursuant to Illinois Supreme Court Rule 375 (eff. Feb. 1, 1994). The trial court ultimately unsealed the settlement transcript and the parties agreed that it would be filed in this court under seal. Upon filing, we reviewed the settlement transcript. Thereafter, we ordered defendants to file an amended motion to dismiss and for sanctions, and allowed plaintiff time to file a response thereto.

¶ 2     Our review of summary judgment orders is typically limited to the materials of record that were before the circuit court at the time summary judgment was entered. *State Farm Mutual Automobile Insurance Co. v. Stuckey*, 112 Ill. App. 3d 647, 649 (1983). This case, however, presents a unique situation that—given our responsibility to "strive to enhance and maintain confidence in our legal system" (Code of Judicial Conduct, Preamble) and our obligation to do substantial justice—has required us to consider events that have been brought to our attention that occurred after entry of these judgments. We find that the contents of the unsealed settlement transcript, as well as other materials contained in the supplemental record before us, lead to the

inescapable conclusion that this appeal is frivolous and is being pursued in bad faith. Pursuant to our inherent authority under Supreme Court Rule 366(a) (eff. Feb. 1, 1994) and for the reasons that follow, we dismiss this appeal and grant defendants' request for sanctions under Supreme Court Rule 375 (eff. Feb. 1, 1994). Furthermore, the clerk of this court is directed to forward a copy of this opinion to the Illinois Attorney Registration and Disciplinary Commission (ARDC) for its consideration.

¶ 3                                    I. BACKGROUND

¶ 4      Plaintiff's complaint alleged that in the early morning of June 13, 2013, plaintiff was transported by ambulance from the Chicago lounge Cuvée to the emergency room at Northwestern, where she was admitted for alcohol intoxication. When she awakened in the emergency room around 11:45 a.m., either plaintiff or her friend contacted Puppala, a fellow in McGaw's Multidisciplinary Pain Medicine fellowship program at Northwestern, and told him that plaintiff was in the hospital. Plaintiff and Puppala knew each other socially; they first met in the winter or spring of 2013, socialized as part of a group on several occasions, and they met alone on two occasions prior to June 2013.

¶ 5      On June 13, 2013, Puppala visited plaintiff twice at Northwestern. The first visit occurred around noon while plaintiff and her friend were in a private bay in the emergency room. Puppala used his credentials to view plaintiff's electronic medical chart and spoke with plaintiff's treating physician regarding her progress and possible discharge. Whether plaintiff consented to Puppala accessing her medical records and speaking with her treating physician was disputed in the circuit court. The second visit occurred around 3 p.m., after plaintiff had been moved from a private bay to the hallway. Puppala took photographs of plaintiff while she was in her hospital bed in a hospital gown attached to an IV with a towel over her head. Puppala posted the

photographs to his Instagram and Facebook accounts, along with a caption that read "Post-Cuvée #bottle #service #gone #bad." Although plaintiff was not named or tagged in the posts, several of plaintiff's acquaintances recognized her as the person in the photo. Whether plaintiff consented to Puppala taking plaintiff's photograph was also disputed in the circuit court. It is undisputed, however, that during his time in the fellowship program, Puppala had disciplinary issues related to his performance, with interacting with patients and patients' families, and with patients' privacy.

¶ 6 Counts I and II of plaintiff's second amended complaint asserted claims of invasion of privacy against defendants. She alleged that Puppala, without plaintiff's consent, "intruded upon seclusion" by accessing plaintiff's medical chart and taking photographs of her while she was hospitalized. She further alleged that defendants improperly caused or allowed the photographs of her hospitalization to be publicized, which were "private facts that were not a legitimate public concern." She alleged that Northwestern provided Puppala with substantial assistance in committing a tort by failing to prevent Puppala from having access to its computer systems and by failing to have proper procedures in place to prevent Puppala from taking photos of patients. Counts III and IV asserted claims for intentional and negligent infliction of emotional distress, respectively, alleging that Puppala's conduct, substantially assisted by Northwestern and McGaw, was extreme and outrageous and caused plaintiff severe emotional distress, and that Puppala either intended to cause plaintiff emotional distress, or his conduct was "recklessly or consciously done in disregard to the probability" of causing plaintiff emotional distress.

¶ 7 Count V asserted a claim of direct negligence against Northwestern and McGaw. Plaintiff alleged that defendants had a duty to protect "patients at their facilities from doctors who are a danger to the patients' physical, emotional, and mental well-being as well as a duty to protect

their patients' privacy rights." She alleged that they breached that duty when they failed to prevent Puppala, whom they knew had a history of misbehavior, from having access to their facilities and computer systems, and that their breach proximately caused plaintiff's injuries. She further alleged that defendants' conduct warranted punitive damages. Finally, in an amendment to her second amended complaint, plaintiff alleged in counts VI-IX that Puppala was McGaw's agent, and that McGaw was therefore vicariously liable for Puppala's conduct as alleged in counts I-IV.[1]

¶ 8    Defendants moved for summary judgment on all of plaintiff's claims against them. On August 7, 2017, after briefing and a hearing, Judge Jerry A. Esrig entered summary judgment in favor of McGaw on count V in plaintiff's second amended complaint. Plaintiff's subsequent motion to reconsider was denied on August 30, 2017. On November 3, 2017, Judge Esrig entered summary judgment in favor of Northwestern on counts I-V of plaintiff's second amended complaint, and also entered summary judgment in favor of McGaw on counts VI-IX in plaintiff's amendment to her second amended complaint.

¶ 9    Plaintiff then proceeded to trial against Puppala before a different judge. On November 21, 2017, during trial, plaintiff and Puppala advised the trial judge that they had reached a settlement that required "the release of Puppala by [p]laintiff and a dismissal of him from this case with prejudice." At counsels' request, the trial judge held a "hearing," transcribed by an official court reporter, that consisted of counsel stating the amount Puppala agreed to pay, that plaintiff agreed to write favorable letters on Puppala's behalf stating the underlying allegations were "mistaken" and that she consented to the photos and the postings, and that the settlement was "confidential." Counsel prepared, and the trial judge entered, a series of orders, including a

---

[1]On June 9, 2016, the circuit court dismissed with prejudice counts I-IV against McGaw from plaintiff's second amended complaint, and that ruling has not been raised in this appeal.

written order sealing the transcript of the November 21, 2017, hearing. Twenty days later, plaintiff filed a timely notice of appeal from the summary judgment orders entered by Judge Esrig. Puppala is not a party to this appeal.

¶ 10     While this appeal was pending, defendants filed a motion in the circuit court to unseal the November 21 hearing transcript and have it made a part of the appellate record. Attached to that motion was the affidavit of Mark J. Lura, one of Northwestern's attorneys, which averred that after the settlement, he

> "5. *** was informed that part of the aforementioned settlement involved Plaintiff providing Dr. Puppala with a document which would be used in defense of a pending investigation by the State of Georgia's Composite Medical Board reviewing Dr. Puppala's conduct which was at issue in this case.
>
> 6. It is my understanding that pursuant to the settlement, Plaintiff provided Dr. Puppala with a documented admission that she had given her consent to Dr. Puppala to take her picture."

¶ 11     After plaintiff filed her appellant's brief, defendants sought to stay this appeal pending the resolution of their motion to unseal the transcript. A different panel of this court denied the motion to stay and subsequently entered a final extension of time for defendants to file their appellate briefs. On February 22, 2019, in conjunction with the filing of their briefs, defendants moved this court to dismiss this appeal and for sanctions pursuant to Rule 375, asserting that Northwestern had

> "obtained reliable information that the settlement agreement between Plaintiff and Puppala included Plaintiff's agreement to provide a document to Dr. Puppala stating that, at a minimum, the photographs were actually taken and posted to

social media with her consent (in other words, that her claims in her lawsuit were without merit) with the intent that Puppala then could provide that letter to medical [*sic*] licensing board of the State of Georgia in order to obtain medical licensure in that state."

¶ 12    The motion further asserted that on February 14, 2019, the trial judge granted defendants' motion to unseal the November 21, 2017, hearing transcript for inclusion in the record on appeal, but—despite the circuit court's order— plaintiff's counsel Joel Brodsky had instructed the court reporter to not provide a copy of the transcript to defendants. As a result, defendants did not have access to the November 21 hearing transcript at the time they filed their appellate briefs or their joint motion to dismiss and for sanctions. Nonetheless, defendants asserted that, assuming their information was correct, plaintiff's appeal was frivolous and was not being pursued in good faith. Furthermore, defendants requested that we sanction plaintiff's counsel for "refus[ing] to provide a transcript and preventing access to the transcript as ordered by the trial court." We ordered that the motion to dismiss and for sanctions be taken with the case.

¶ 13    Back in the circuit court, the trial judge entered an agreed order stipulating that the appellate record would be supplemented with certain filings, including the November 21 hearing transcript. This court then allowed defendants' motion to file a third supplemental record containing the November 21 hearing transcript *instanter*, and we allowed the filing of the supplemental materials as a supporting record for defendants' pending motion to dismiss and for sanctions. Plaintiff filed a motion to strike the third supplemental record, contending that the transcript of the November 21 hearing was not before the circuit court during the summary judgment proceedings, and was therefore not relevant to any of the issues on appeal. We denied plaintiff's motion to strike the third supplemental record.

¶ 14 The transcript of the November 21 hearing reflects that Brodsky and attorney Patrycja Karlin appeared on behalf of plaintiff and attorneys Mario Utreras and Rafael Vargas appeared on behalf of Puppala. While addressing the trial judge, Utreras stated, "So I'm going to read in both the Settlement Agreement, which incorporates a confidential letter that the Plaintiff is going to write. But the Settlement Agreement itself will not reference said letter and that letter will only be referenced in this sealed transcript." Brodsky then stated, "I think we're going to have a letter, and we're to have a short agreement that's going to go with the letter that references [Illinois Rule of Evidence 408 (eff. Jan. 1, 2011)] unless that goes into the letter, either way as long as I have that document." Before Utreras explained the terms of the settlement, Brodsky stated, "This is the agreement, and we're going to formalize it in writing." Utreras then explained that Puppala agreed to pay plaintiff $250,000 to settle plaintiff's claims and that plaintiff agreed to:

> "write a letter of explanation as part of the settlement, which will not be mentioned in the formal Settlement Agreement itself, but is part of the agreement terms[.]

> * * *

> [Puppala] intends to use this letter for prospective employers, licensing and/or certified medical boards, governing regulatory bodies, hospitals, medical staff offices, lenders, financial institutions, and insurers, and any entities that have opined or written on the pending lawsuit against [*sic*] Plaintiff and [Puppala] and any other licensing or employment entity for which he may require the same.

> *This letter shall state that after reviewing the testimony, evidence and additional information provided during trial, Plaintiff now believes that she was*

8

*mistaken as to her recollection of the events on June 13, 2013 regarding the allegations she made concerning Defendant's conduct and her consent as to the access of her medical chart, posting of photos, and that she accepts the amicable resolution of the case.*

The letter shall indicate that there is no malice, ill will or intent for any harm she alleged and *that [Puppala] is* [*sic*] *not acting in any capacity as a treating physician.*" (Emphases added.)

¶ 15    Utreras further outlined the parties' agreement, telling the trial judge that any letter written by plaintiff would be provided to third parties only if the third party signed a nondisclosure agreement (NDA) that contained a liquidated damages clause. A NDA would not be required for letters sent to licensing boards, certification boards, or credentialing hospitals, provided that the letters were kept under seal. The transcript reflects that Brodsky then stated

"Just two little points.

The letter itself or an agreement regarding the letter, if you want to do like a little side agreement, which [*sic*] is all confidential and part of the same thing.

It's to state that under Illinois rule—pursuant to Illinois Rule of [E]vidence 408, which is the provision that states that, you know, it can't be introduced into evidence against either party. It's part of a [s]ettlement [a]greement, and, therefore, it's inadmissible under Rule 408.

\* \* \*

We can either do it in the body of the letter or in a side agreement regarding the letter. It doesn't matter as long as it's there."

¶ 16    No formal written settlement agreement between plaintiff and Puppala has been made part of the record, and no mention was made during the November 21 hearing as to whether Puppala admitted any liability.

¶ 17    After this court reviewed the November 21 hearing transcript, we ordered that defendants file an amended motion to dismiss the appeal and for sanctions in light of the contents of the November 21 transcript, and that plaintiff file a response thereto. Defendants' joint amended motion to dismiss and for sanctions highlights the contradiction between plaintiff's arguments on appeal regarding Puppala's alleged conduct and plaintiff's alleged lack of consent, and the representations made by plaintiff's and Puppala's counsel to the trial judge during the November 21 hearing. Defendants reassert that plaintiff's appeal is frivolous and is being pursued in bad faith, that Brodsky's conduct in directing the court reporter to not hand over the transcript in a timely fashion caused additional delay and needless expense in litigating this appeal, and that sanctions are warranted.

¶ 18                              II. ANALYSIS

¶ 19    This court has the authority to "make any other and further orders and grant any relief *** that the case may require." Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994). Furthermore, Rule 375(b) "allows us to impose an appropriate sanction upon a party or a party's attorney if we determine that the appeal was frivolous or not taken in good faith." *U.S. Bank N.A. v. Coe*, 2017 IL App (1st) 161910, ¶ 21. Rule 375(b) provides,

> "If, after consideration of an appeal or other action pursued in a reviewing court, it is determined that the appeal or other action itself is frivolous, or that an appeal or other action was not taken in good faith, for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation,

or the manner of prosecuting or defending the appeal or other action is for such purpose, an appropriate sanction may be imposed upon any party or the attorney or attorneys of the party or parties. An appeal or other action will be deemed frivolous where it is not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law. An appeal or other action will be deemed to have been taken or prosecuted for an improper purpose where the primary purpose of the appeal or other action is to delay, harass, or cause needless expense." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994).

¶ 20    First, we address three preliminary matters raised in plaintiff's response to the motion to dismiss and for sanctions.[2] Plaintiff renews her motion to strike the third supplemental record. Her request, which is essentially a motion to reconsider a portion of our May 31 order denying her motion to strike the third supplemental record, is improper because it violates this court's rule that prohibits responses "that include in the response a new motion or request for [the responding party's] own relief." Ill. App. Ct., First Dist. R. 4G (July 1, 2008). We decline to reconsider our previous order.

¶ 21    Plaintiff's motion to strike the third supplemental record relied on *Jordan v. Knafel*, 355 Ill. App. 3d 534, 540 (2005) to argue that "[t]here is a presumption in law that favors of [*sic*] the validity of the confidentiality provisions in settlement agreements." *Jordan* does not apply here because the issue before us does not involve the enforceability of a contractual confidentiality provision. Before the trial court and on appeal, plaintiff's counsel argues that plaintiff and

---

[2]We note that on June 19, 2019, our supreme court suspended Brodsky from the practice of law until further order of court during the pendency of the Attorney Registration and Disciplinary Commission's disciplinary proceedings against him. Plaintiff's response to the amended motion was filed on June 28, 2019, and was signed by Karlin only and not by Brodsky.

Puppala represented that the settlement was "confidential," which, in plaintiff's view, ends the matter. Apparently, plaintiff's counsel does not understand that when Utreras and Brodsky described the terms of the settlement to the trial judge while it was being transcribed by a court reporter, any confidences they thought existed evaporated. The erroneous belief that sealing the transcript would preserve those confidential terms does not save them. By informing the trial judge of the settlement terms on the record, counsel made those terms a part of the public record presumptively accessible by the public. *Coy v. Washington County Hospital District*, 372 Ill. App. 3d 1077, 1079 (2007). Had counsel merely advised the trial judge of the existence of a "confidential settlement" without describing the terms, whatever confidential terms the parties agreed to likely would have remained confidential. But by explaining to the trial judge in front of a court reporter the terms of their "confidential" settlement and the terms of their agreement— specifically plaintiff's consent to and "mistaken" beliefs as to Puppala's conduct, and the letters that plaintiff would write—the court order sealing the transcript notwithstanding—the parties lost the confidentiality they sought.

¶ 22    The circuit court was correct in unsealing the transcript because it was incumbent on plaintiff to show both a compelling interest for restricting access and that any restriction furthering that interest was tailored as narrowly as possible. *Coy*, 372 Ill. App. 3d at 1080. The trial judge found that plaintiff had not met that burden and reversed its prior order sealing the transcript, finding that public policy weighed in favor of it being unsealed. Counsel divulged the terms of a confidential settlement agreement to the court and, as a result, jeopardized the confidentiality that their clients thought they had. If parties or counsel want to keep settlement agreements confidential, they should not discuss confidential terms on the record. As we observed in *Coy*,

"[w]hen a settlement agreement is filed with a court, the presumptive right of public access to judicial records attaches to that agreement. [Citation.] The way to avoid the attachment of the presumption with regard to a settlement agreement is simple: the parties to a case 'are free to make whatever contractual arrangements they wish as part of their settlement agreement *and keep it to themselves* by simply not making it part of the court record.' " (Emphasis in original.) *Id.* (quoting *In re Marriage of Johnson*, 323 Ill. App. 3d 1068, 1076 (1992) (Steigmann, J., specially concurring)).

¶ 23    Next, in her response to the amended motion to dismiss and for sanctions, plaintiff insists that any statements, documents, or letters that are part of her settlement with Puppala are governed by Rule 408, and cannot be used for any purpose. Plaintiff is correct in her assertion that evidence of "furnishing or offering or promising to furnish—or accepting or offering or promising to accept—a valuable consideration in compromising or attempting to compromise the claim" and "conduct or statements made in compromise negotiations regarding the claim" is inadmissible "to prove liability *** or to impeach through a prior inconsistent statement or contradiction[.]" Ill. R. Evid. 408(a). However, such evidence may be admissible to establish bad faith. *Id.* § 408(b). Here, the gist of defendants' motion to dismiss and for sanctions is that this appeal is frivolous and that plaintiff filed this appeal in bad faith based on the representations documented in the November 21 hearing transcript. Rule 408 does not categorically bar the use of the November 21 hearing transcript for all purposes, nor does the mere incantation of Rule 408 act as a prohibition against inquiries into settlement negotiations to establish wrongdoing.

¶ 24    In support of her contention, plaintiff cites to *Hana v. Illinois State Medical Inter-Insurance Exchange Mutual Insurance Co.*, 2018 IL App (1st) 162166, which is inapposite. In

*Hana*, the plaintiffs sued defendant Illinois State Medical Inter-Insurance Exchange Mutual Insurance Co. (ISMIE) to recover damages "for ISMIE's alleged bad-faith failure to settle an underlying lawsuit." *Id.* ¶ 1. We addressed ISMIE's argument that the circuit court should have barred the plaintiffs from introducing a letter from the plaintiffs' attorney to ISMIE offering to settle the bad faith claim during the pendency of the bad faith claim litigation. *Id.* ¶ 28. We found that the letter was inadmissible under Rule 408(b), observing that

> "[w]hile Rule 408 does allow the introduction of evidence of settlement offers and negotiations to establish bad faith, we do not believe that this exception includes the introduction of evidence with respect to the settlement of the *present litigation* so as to establish ISMIE's bad faith with respect to its handling of the *underlying case*. While no Illinois case has addressed this specific issue, we note that Rule 408 'mirrors the Federal Rule 408, which our state courts have been applying to cases for years.' [Citation.] At least one federal court has recognized that evidence of an insurer's refusal to settle a bad faith case is inadmissible for the purpose of establishing the insurer's bad faith in handling an underlying matter. [Citation.] This is consistent with the underlying policy of Rule 408; *i.e.*, promoting settlement." (Emphasis in original.) *Id.* ¶ 30.

¶ 25    The record before us bears no resemblance to *Hana*, and the referenced discussion in *Hana* is narrower than plaintiff contends. *Hana* stands for the proposition that the refusal of an offer to settle a bad faith claim is inadmissible to prove that a refusal to settle an underlying claim amounted to bad faith. More critical to the holding in *Hana*, however, was our observation that the plaintiff's offer—and ISMIE's refusal—to settle the bad faith claim was not relevant "to whether ISMIE engaged in bad faith and willful and wanton conduct leading to the [underlying]

judgment." *Id.* ¶ 32. Here, Northwestern and McGaw have alleged that plaintiff's claims never had any merit because she has now admitted that she was mistaken about her recollection of the events forming the basis of her claims. In other words, they allege that plaintiff's entire lawsuit was brought in bad faith because she lacked an adequate factual basis for her claims from the beginning. The contents of the November 21 hearing transcript are certainly relevant, as they establish a willingness to disclaim the core facts in support of plaintiff's claims. We therefore do not agree with plaintiff that Rule 408 bars the admission into evidence of the contents of the November 21 hearing transcript.

¶ 26    Finally, we agree with plaintiff that certain exhibits to defendants' amended motion to dismiss and for sanctions are not part of the record on appeal and should be stricken. Specifically, exhibits B, C, D, E, F, and G, consisting of emails between plaintiff's and defendants' counsel sent after the unsealing of the settlement transcript, are not part of the record and have not been supported by affidavit or verification in compliance with Rule 361(a). Rule 361(h)(3)(d) requires that a dispositive motion contain an "appropriate supporting record containing (i) if the record on appeal has not yet been filed, the parts of the trial court record necessary to support the dispositive motion; and (ii) if necessary, any evidence of relevant matters not of record in accordance with Rule 361(a)." Rule 361(a) provides in relevant part that "When the [dispositive] motion is based on facts that do not appear of record it shall be supported by affidavit or verification by certification pursuant to section 1-109 of the Code of Civil Procedure." Ill. S. Ct. R. 361(a) (eff. July 1, 2017). Here, there is no verification attached to or included with these exhibits. We therefore will not consider exhibits B through G to defendants' amended motion to dismiss and for sanctions.

15

¶ 27    We turn now to our disposition. It is axiomatic that the amicable settlement of a dispute is encouraged and the parties are free to settle a dispute on a confidential basis. Settlement agreements are contracts, the terms of which—including confidentiality provisions—will be enforced unless the agreement violates public policy. *Fidelity Financial Services, Inc. v. Hicks*, 267 Ill. App. 3d 887, 892 (1994). We presume that the parties' attorneys have the authority to negotiate and create a settlement on behalf of their clients. *Brewer v. National R.R. Passenger Corp.*, 165 Ill. 2d 100, 106 (1995). Absent a specific provision to the contrary, a party is bound by the acts or omissions of her attorney during settlement negotiations. *In re Marriage of Marr*, 264 Ill. App. 3d 932, 934 (1994). Here, the statements made by Puppala's attorney Utreras, were agreed to by plaintiff's counsel Brodsky, during the November 21 hearing. Plaintiff has not directly questioned the accuracy of the substance of plaintiff's and Puppala's agreement which, on its face, is irreconcilable with plaintiff's continued pursuit of her claims against defendants. As explained by plaintiff's and Puppala's counsel to the circuit court, the terms of plaintiff's and Puppala's agreement require plaintiff, in return for a substantial monetary payment, to write letters to "prospective employers, licensing and/or certified medical boards, governing regulatory bodies, hospitals, medical staff offices, lenders, financial institutions, and insurers" disclaiming the material facts that form the basis of all of her claims against Puppala. Plaintiff, through her attorney, agreed to categorically state that she "now believes that she was mistaken as to her recollection of the events on June 13, 2013 regarding the allegations she made concerning [Puppala's] conduct and her consent as to the access of her medical chart [and] posting of photos." These representations diametrically contradict the factual allegations in her complaint, especially as they relate to the direct and vicarious liability claims made against defendants that are integral to the summary judgments orders before us on appeal.

16

¶ 28    We recognize that a plaintiff might compromise her claims for a variety reasons. For example, a plaintiff may settle to obtain an early resolution in order to avoid protracted litigation and added expense, or she may settle after a candid assessment of the strength of her case and how the claims might fare before a finder of fact. Or there may be less honorable reasons to settle that go unexpressed. Here, plaintiff's release of her claims against Puppala in exchange for money is rather unremarkable, both as to her willingness to settle and his willingness to pay. Parties settle meritorious and unmeritorious claims all the time. What is remarkable here is the acquiescence of plaintiff's attorneys to Utreras's representations to the trial judge that plaintiff agreed to write letters to various licensing bodies and institutions stating that "she was mistaken as to her recollection of the events on June 13, 2013 regarding the allegations she made concerning [Puppala's] conduct and her consent as to the access of her medical chart [and] posting of photos." Brodsky did not disagree and he then emphasized to the trial judge that the parties agreed that any such letters would be part of the settlement agreement and would be confidential. We are troubled that plaintiff, through her counsel, affirmatively agreed to fully exonerate Puppala by providing confidential letters to institutions responsible for regulating the practice of medicine, insurers, or financial institutions that completely contradict the factual bases of this lawsuit; she agreed to state that it was all a mistake and that she consented to Puppala's access to her medical records and the posting of her photos. As acknowledged by counsel, these letters would be sent with the intent to favorably influence regulatory or financial decisions involving Puppala, while simultaneously allowing plaintiff to continue her quest for money damages against defendants under theories of direct and vicarious liability for Puppala's allegedly tortious conduct. On its face, this settlement can reasonably be characterized as a duplicitous scheme by plaintiff to protect Puppala's professional licensing prospects and his

17

financial well-being in return for money, while retaining the ability to seek more money from two healthcare institutions through the prosecution of claims that she will now unequivocally state were based on "consensual" conduct and the result of a "mistake."

¶ 29    In her response to the motion to dismiss and for sanctions, plaintiff brazenly insists that there is no evidence that plaintiff ever actually wrote any letters as outlined at the November 21 hearing, and that there is no evidence of sanctionable conduct. Plaintiff ignores Lura's affidavit, in which he averred that he obtained information that plaintiff provided Puppala with a letter as part of an investigation in Georgia (where Puppala now practices medicine), stating that she had consented to Puppala taking her photograph. Plaintiff has not filed a counter-affidavit in this appeal, nor has she attempted to file anything that attempts to call into question the existence or accuracy of the settlement as described to the trial judge, or the contents of Lura's affidavit. In responding to defendants' original and amended motions to dismiss and for sanctions, plaintiff has never come forward with any evidence to refute, contradict, or deny defendants' assertions. As it stands, the record before this court reflects that plaintiff agreed to tell the world that her claims of misconduct by Puppala did not happen, and that she has told the licensing authority in Georgia just that. This court will not abide the duplicity of plaintiff's conduct.

¶ 30    Plaintiff's appellate counsel nonchalantly urges us to consider her appeal because "[p]laintiff wonders what the hurry is; if the summary judgment is affirmed then there is no issue about any admission, and if the summary judgment is overruled, then the trial court can deal with the issue with all of the facts before it." This total lack of respect for the appellate process is stunning. It manifests a disregard for the truth seeking process, it fails to adhere to the standards of professional conduct, and it attacks the fundamental integrity of our judicial system. To conduct a review of these summary judgment orders—a review in which we would strictly

construe the factual record in the light most favorable to plaintiff to determine the existence of a genuine issue of material fact (*West Bend Mutual Insurance Co. v. DJW-Ridgeway Building Consultants, Inc.*, 2015 IL App (2d) 140441, ¶ 20)—would be engaging in a fundamentally infirm process: we would be conducting a *de novo* review despite having every confidence that the allegations and supporting facts under review are likely not true. Furthermore, it is inconceivable that plaintiff and her attorneys were unaware that the letters plaintiff agreed to write on Puppala's behalf were entirely inconsistent with the factual record before the circuit court at the time it entered summary judgment. Based on the record before us and the absence of anything to the contrary, plaintiff did in fact tell a licensing board in Georgia as part of its investigation of Puppala that she had consented to Puppala taking her photograph. Therefore, her appeal from the circuit court's judgments can no longer be considered "reasonably well grounded in fact" or "warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law" (Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994)), no matter how confidential she believed her statements to the Georgia licensing board to be. In undertaking this appeal, plaintiff and her attorneys intended to continue litigation against defendants based on factual allegations that plaintiff has agreed to disclaim to virtually anyone interested in Puppala's professional and financial history.

¶ 31    We find that this appeal is frivolous and has not been pursued in good faith. Our judicial obligation to "strive to enhance and maintain confidence in our legal system" precludes us from considering this appeal on the merits. Pursuant to our authority under Rule 366(a)(5), we leave plaintiff in the position she placed herself in when she agreed to the settlement terms that were then disclosed in open court. We grant defendants' motion for Rule 375 sanctions and dismiss this appeal. To assist in our determination of an appropriate monetary sanction, defendants may

19

submit statements of their reasonable attorney fees and costs incurred as a result of defending against this frivolous appeal. Defendants are directed to file statements of their reasonable attorney fees and costs incurred as a result of this appeal within 21 days of the filing of this opinion. Plaintiff and her attorneys shall have 14 days to file a response. We will enter a supplemental opinion determining an appropriate monetary sanction imposed on plaintiff and her attorneys in due course. See *Dreisilker Electric Motors, Inc. v. Rainbow Electric Co.*, 203 Ill. App. 3d 304, 312-13 (1990).

¶ 32    In addition to finding that this appeal is frivolous and was filed in bad faith, we cannot turn a blind eye to defendants' allegation that after the November 21 hearing transcript was unsealed, Brodsky instructed the court reporter to not provide defendants with a copy of the hearing transcript. Plaintiff's response to defendants' motion to dismiss does not specifically contest this allegation, but instead offers justifications for Brodsky's conduct. Having reviewed the allegations in the motion to dismiss and for sanctions, we direct the clerk of this court to forward a copy of this opinion to the ARDC for its consideration.

¶ 33                                  III. CONCLUSION

¶ 34    For the foregoing reasons, we dismiss plaintiff's appeal and grant defendants' motion for Rule 375 sanctions. Defendants are directed to file a statement of reasonable attorney fees and costs incurred as a result of this appeal within 21 days of the filing of this opinion. Plaintiff and her attorneys shall have 14 days to file a response. A supplemental opinion determining an appropriate monetary sanction imposed on plaintiff and her attorneys will be entered in due course. Furthermore, we direct the clerk of this court to forward a copy of this opinion to the ARDC for its consideration.

¶ 35    Appeal dismissed; sanctions imposed; opinion referred to the ARDC.

¶ 36                                    **SUPPLEMENT TO OPINION**

¶ 37    Following our opinion, Karlin sought leave to withdraw as Chernyakova's attorney, citing a potential conflict of interest. Chernyakova did not oppose Karlin's motion, which we allowed, and Chernyakova has filed a *pro se* appearance. Brodsky's license to practice law remains subject to an interim suspension, and he has not filed anything on Chernyakova's behalf. Brodsky, through his own counsel, filed a petition for rehearing, which Chernyakova and Karlin adopted,[3] asserting that we erred in finding that plaintiff's appeal was frivolous and brought in bad faith. Plaintiff, Brodsky, and Karlin did not object to the dismissal of plaintiff's appeal. We denied plaintiff's petition for rehearing in a separate order.

¶ 38    Northwestern and McGaw have filed their statements of reasonable attorney fees and costs. Northwestern requests attorney fees of $105,453.25, plus $7825.58 in costs. Northwestern's statement is supported by several affidavits, which are in turn supported by billing invoices and cost/expense invoices. Northwestern highlights the "dual track" of the appellate proceedings, which required defendants to obtain the supplemental record containing the November 21 hearing transcript and facts surrounding the settlement, while also briefing the merits of plaintiff's arguments on appeal. McGaw's statement of attorney fees requests attorney fees of $42,125.50, plus $30.87 in costs. McGaw's statement is supported by its attorney's affidavit. McGaw notes that efforts were made to coordinate with Northwestern's counsel to reduce appellate costs, and that McGaw is not seeking all of its attorney fees. McGaw's statement is also supported by detailed billing invoices.

¶ 39    Karlin has filed a response to defendants' statements of fees and costs, which Brodsky, through counsel, joined and Chernyakova adopted in part, raising several objections to

_____

[3]When the petition for rehearing was filed, we had not yet allowed Karlin's motion to withdraw as Chernyakova's attorney of record. Karlin filed a motion on behalf of Chernyakova to adopt the petition for rehearing in order to preserve Chernyakova's rights, which we allowed.

defendants' supporting affidavits and invoices, and asserting that the overall attorney fees sought are excessive. The joint response asserts that defendants' attorney fees and costs have been paid by insurance, and should be reduced to avoid a windfall to defendants. Chernyakova has also filed a separate response to defendants' statements of fees and costs, asserting in part that she relied on her attorneys' advice in prosecuting her claims in the circuit court and in this court, as she had done when she agreed to the terms of the settlement with Puppala.

¶ 40 Rule 375(b) provides that "[a]ppropriate sanctions for violation of this section may include an order to pay to the other party or parties damages, the reasonable costs of the appeal or other action, and any other expenses necessarily incurred by the filing of the appeal or other action, including reasonable attorney fees." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). "The purpose of Rule 375(b) is to condemn and punish the abusive conduct of litigants and their attorneys who appear before us." *Fraser v. Jackson*, 2014 IL App (2d) 130283, ¶ 51 (citing *Sterling Homes, Ltd. v. Rasberry*, 325 Ill. App. 3d 703, 709 (2001)). "The imposition of Rule 375 sanctions is left entirely to the discretion of the reviewing court." *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 87 (citing *Kheirkhahvash v. Baniassadi*, 407 Ill. App. 3d 171, 182 (2011)). Rule 375(b) does not direct us to impose any particular sanction, but rather gives us the discretion to impose an "appropriate sanction." Ill. S. Ct. R. 375(b).

¶ 41 After considering all of the parties' and attorneys' submissions, we find that an appropriate monetary sanction is $15,000 in favor of defendants and against Brodsky and Karlin. We find that the appropriate sanction against Brodsky, as the lead attorney in the circuit court and on appeal before his interim suspension, is $11,250. We further find that the appropriate sanction against Karlin, as a participating attorney for plaintiff in the circuit court and on appeal, is $3750. Payment should be made to Northwestern and McGaw jointly. From the gross

payment, Northwestern is entitled to $7500, and McGaw is entitled to $7500, or as otherwise agreed to between them. We decline to impose any monetary sanction against Chernyakova individually.

¶ 42    In reaching our conclusion, we have considered that Chernyakova, who has no legal training or experience, presumably relied on her attorneys' advice in pursuing this appeal after entering into the settlement agreement with Puppala. We have also considered Chernyakova's current income as set forth in a declaration to her response, and find that the imposition of a monetary sanction is likely to cause substantial financial harm and therefore unwarranted. The dismissal of Chernyakova's appeal served as an appropriate sanction to impress upon her and future litigants that the appellate process is to be taken seriously.

¶ 43    With respect to Brodsky and Karlin, we have also considered that, even if we were to find all of Northwestern's and McGaw's attorney fees and costs to be reasonable, a sanctions award against the attorneys for the full amount of attorney fees and costs requested would be excessive, and would likely cause severe financial distress to both Brodsky and Karlin. While the purpose of Rule 375(b) is to punish abusive conduct, that punishment should not result in the sanctioned parties' financial ruin.

¶ 44    As a final matter, Brodsky and Karlin assert that we should remand this matter to the circuit court for an evidentiary hearing on the amount of sanctions to be imposed. They contend that "[v]ery often [attorney] fee petitions require evidentiary hearings to resolve disputed issues." They argue that, absent a remand and evidentiary hearing, they are being deprived of their "constitutional right to appellate review of an order against [them]." We disagree.

¶ 45    First, Rule 375(b) provides

> "If, after consideration of an appeal or other action pursued in a reviewing court, it is determined that the appeal or other action itself is frivolous, or that an appeal or other action was not taken in good faith, for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation, or the manner of prosecuting or defending the appeal or other action is for such purpose, an appropriate sanction may be imposed upon any party or the attorney or attorneys of the party or parties." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994).

The committee comments to Rule 375 provide, in part,

> "No formal hearing process is envisioned before a sanction will be imposed; rather, any sanction imposed will be by a procedure summary in nature and will not involve the formalities required in procedures for citations of contempt of court.
>
> * * *
>
> The determination that the appeal is frivolous or the conduct is improper is based on an objective standard of conduct, *viz.*, an appeal will be found to be frivolous if a reasonable prudent attorney would not in good faith have brought such an appeal, or the appeal conduct will be found to be improper if a reasonable prudent attorney would not have engaged in such conduct." Ill. S. Ct. R. 375, Committee Comments (Aug. 1, 1989).

It is clear that our supreme court has authorized this court, under certain circumstances and in an exercise of our discretion, to impose appropriate sanctions on appellate litigants or their attorneys without conducting a formal hearing, or remanding to the circuit court for any similar

24

proceeding. Even assuming—without deciding—that we have the discretion to order such a hearing, either in this court or in the circuit court, we decline to exercise that discretion here.

¶ 46    Second, there is no constitutional right to appellate review of an intermediate appellate decision in this state, except in limited circumstances not present here. The Illinois Constitution provides

> "Appeals from the Appellate Court to the Supreme Court are a matter of right if a question under the Constitution of the United States or of this State arises for the first time in and as a result of the action of the Appellate Court, or if a division of the Appellate Court certifies that a case decided by it involves a question of such importance that the case should be decided by the Supreme Court. The Supreme Court may provide by rule for appeals from the Appellate Court in other cases." Ill. Const. 1970, art. VI, § 4(c).

Our supreme court has not provided any rules authorizing appeals as a matter of right from the imposition of appellate sanctions. Instead, our supreme court's rules provide that we may, in an exercise of our discretion, sanction appellate litigants or their attorneys for their conduct in this court. Ill. S. Ct. R. 375. Our imposition of monetary sanctions against Brodsky and Karlin does not violate their constitutional rights.